UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

DARCY A. HAGER,

               Debtor.

_____/

Case No. 17-01593
Hon. Scott W. Dales
Chapter 13

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                   Chief United States Bankruptcy Judge

I.  INTRODUCTION

Soon after getting a chapter 7 discharge in an earlier case in this court, Darcy A. Frantz-Hager (the "Debtor") experienced job loss while receiving only sporadic support payments from her ex-husband and began a not-so-successful gambling streak, racking up new debt in the process. Unable to service her debts, old and new, she again turned to the court, this time filing for relief under chapter 13.

The Debtor proposed a repayment plan that met with the approval of the chapter 13 trustee, but after her former lawyer and current creditor, Lawrence W. Newmeyer, objected to confirmation, the court held an evidentiary hearing to consider whether to confirm her plan. The court heard her testimony, admitted 19 exhibits, most without objection, and took the matter under advisement.

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, made applicable to this contested matter by Fed. R. Bankr. P. 9014 and 7052. For the following reasons, the court will deny confirmation.

## II.  JURISDICTION

The Debtor's filing of a chapter 13 petition with this court commenced a bankruptcy case within the jurisdiction of the United States District Court for the Western District of Michigan under 28 U.S.C. § 1334(a).  Pursuant to 28 U.S.C. § 157(a) and L. Civ. R. 83.2(a) (W.D. Mich.), the District Court has referred the Debtor's case and all related proceedings to the United States Bankruptcy Court.  A confirmation hearing, such as the court held on August 17, 2017, is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(L).  The court, therefore, has ample authority to resolve the parties' dispute about the confirmation of the Debtor's plan.

## III.  ANALYSIS

A.    Applicable Law

At a confirmation hearing, the objecting party has the initial burden to produce evidence in support of an objection, but a debtor has the ultimate burden of establishing by a preponderance of the evidence that her chapter 13 plan meets the confirmation requirements prescribed in § 1325. *In re Lofty*, 437 B.R. 578, 584 (Bankr. S.D. Ohio 2010); *see also Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123, 1126 (6th Cir.1990); *Ed Schory & Sons, Inc. v. Francis (In re Francis)*, 273 B.R. 87, 91 (6th Cir. BAP 2002).

In the present case, chapter 13 trustee Barbara P. Foley, Esq. (the "Trustee") is satisfied that the Debtor has met the requirements, as evident in the Declaration of Courtney K. Roberts, Esq. (Exh. 14), and in Ms. Roberts's statements at the hearing in her capacity as counsel for the Trustee.  Nevertheless, the court has an independent obligation to evaluate every chapter 13 plan and reach its own conclusions.  As Ms. Roberts observed during the hearing, "reasonable minds may disagree."  The principal disputes presented for decision at the confirmation hearing involved the feasibility of the Debtor's chapter 13 plan and her good faith in filing it.

The question of a plan's feasibility stems from the statute's requirement that "the debtor will be able to make all payments under the plan and to comply with the plan."  11 U.S.C. § 1325(a)(6).  The prediction that the statute requires, though somewhat data-driven, is hardly scientific, and generally calls upon common sense, not prescience.  In order to confirm a plan, the court must find, again by a preponderance of the evidence, that the debtor will perform as she proposes, generally by making payments necessary to fund a dividend to creditors, satisfying their claims in whole or (as in this case) in part.  The finding that a plan is feasible, of course, is no guarantee of success, merely an informed forecast.

With respect to the other main point of contention -- the Debtor's good faith (or lack thereof) -- the text of the Bankruptcy Code provides far less guidance.  As the court observed in a slightly different context, the Bankruptcy Code does not define what it means for a debtor to commence or prosecute a case in "good faith," although the requirement of good faith pervades every proceeding under Title 11.  *In re Riedy*, 517 B.R. 88 (Bankr. W.D. Mich. 2014) (citing *Alt v. United States (In re Alt)*, 305 F.3d 413, 419 (6th Cir.2002) (applying totality of circumstances test to chapter 13 dismissal motion); *Metro Employees Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah)*, 836 F.2d 1030, 1033 (6th Cir.1988) (applying totality of circumstances to determine good faith as part of confirmation); *Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852, 859 (6th Cir.1988) (same).

Good faith is the foundation undergirding the "basic policy animating the Code" of granting relief only to the "honest but unfortunate debtor."  *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (citing *Grogan v. Garner,* 498 U.S. 279, 287 (1991); *Brown v. Felsen,* 442 U.S. 127, 138 (1979)).  Given the centrality of the principle, the Sixth Circuit Court of Appeals has on several

occasions and in different contexts identified guideposts or factors to assist the lower courts in making the determination.  *Riedy*, *supra*, 517 B.R. at 91.  Those criteria include:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
>
> (2) the debtor's employment history, ability to earn and likelihood of future increase in income;
>
> (3) the probable or expected duration of the plan;
>
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
>
> (5) the extent of preferential treatment between classes of creditors;
>
> (6) the extent to which secured claims are modified;
>
> (7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;
>
> (8) the existence of special circumstances such as inordinate medical expenses;
>
> (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
>
> (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;
>
> (11) the burden which the plan's administration would place upon the trustee; and,
>
> (12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*See In re Okoreeh-Baah*, 836 F.2d at 1032.  The factors identified in the various opinions are not exhaustive and have no talismanic significance, so the trial courts enjoy considerable leeway in making this inherently factual determination.  This court has recently described the good faith standard as "flexible and fact-specific."  *In re Gomery*, 523 B.R. 773 (Bankr. W.D. Mich. 2015).

B.      The Plan and Claims

The Debtor filed her chapter 13 petition on March 31, 2017, together with a proposed Original Chapter 13 Plan (ECF No. 4) using the local model plan format.  *See* Exh. 2.  On May 30, 2017 and July 24, 2017, she filed pre-confirmation amendments to the chapter 13 plan (ECF Nos. 20 and 29, and with ECF No. 4 referred to herein as the "Plan").  *See* Exh. 3.[1]  Pursuant to the Plan, the Debtor proposes to remit $2,780.00 per month (the "Plan Payment") to the Trustee who, if the Plan is confirmed, will make payments to secured and unsecured creditors alike.

According to Schedule I and J, the Debtor's Plan Payment comes from her income as a contract-paralegal at Haskell Law in Grand Rapids, Michigan, where she has worked for approximately two years, and from her "Ex-Husband's Contribution to Household Expenses" in the amount of $750.00, which he reportedly pays to live in the Debtor's residence, a condominium unit on River Island Drive, in South Haven, Michigan (the "Condo").

Under her Plan, the Debtor proposes to pay unsecured creditors a dividend of $2,000.00 to be shared *pro rata*.  According to the claims register, there are $79,288.82 in general unsecured claims.  In addition, there are $3,962.00 in unsecured priority claims from the state and federal taxing authorities.  According to the Debtor's schedules, Mr. Newmeyer holds the single largest unsecured claim ($13,769.00 according to Debtor's Exh. 1, and slightly more according to Mr. Newmeyer).  Her other unsecured debts include miscellaneous credit card and medical debt, as well as several educational loans, presumably excepted from discharge under § 523(a)(8) as in her first case.  In the aggregate, her education debt exceeds the dischargeable general unsecured claims.

---

[1] After the hearing, the Debtor filed her Third Pre-Confirmation Amendment to Chapter 13 Plan, adding an account number associated with the automobile loan.

For secured claims, the exhibits and testimony established that the Debtor has two mortgages encumbering the Condo:  a first mortgage in favor of Select Portfolio Services, Inc., in the amount of $308,820.91, and a second mortgage in favor of the Mortgage Electronic Registration System or "MERS" in the amount of approximately $15,000.00, according to the Debtor's Exh. 1.  Through her Plan, the Debtor proposes to "cure and maintain" payments on the first mortgage under § 1322(a)(5), and to "strip off" the second mortgage as wholly unsecured. Although the Debtor indicated that the first and second mortgage debts predate her first bankruptcy filing and that she reaffirmed these debts, the docket from the earlier proceeding does not reflect the filing of any reaffirmation agreement. *See In re Hager*, Case No. 09-14959 (Bankr. W.D. Mich.).  Therefore, the Condo-related debts may have been discharged in 2010 and she may not remain personally obligated to pay these claims.  *See* Fed. R. Evid. 201 (judicial notice); 11 U.S.C. § 524(c)(3) (reaffirmation agreement must be filed with the court to be enforceable).  Nevertheless, after *Johnson v. Home State Bank*, 501 U.S. 78 (1991), each of the lenders has a "claim" that can be addressed under the Plan, even if they cannot pursue the Debtor personally.  Neither lender objects to the treatment the Debtor has proposed.

With respect to the debt secured by the Debtor's vehicle -- a 2013 Chevrolet Equinox -- the Plan proposes to pay $18,320.86, in equal monthly payments of $350.00.  The automobile lender, Ally Bank, a 910-day creditor under the so-called "hanging paragraph" at the end of § 1325(a), has not objected to its treatment under the Plan either.

C.    The Condo

The largest issue between the Debtor and Mr. Newmeyer is the Condo, mainly because Mr. Newmeyer believes the Debtor is unfairly retaining a more expensive residence than she needs, and doing so at his expense.  He argues that requiring her unsecured creditors to share a $2,000.00

dividend while she pays more than she needs to for suitable housing evidences bad faith. He also argues, in effect, that she cannot afford the Condo.

The Debtor and her ex-husband, James Hager, originally purchased the Condo as a "summer home" near Lake Michigan in the resort community of South Haven roughly 58 miles away from Grand Rapids. After their separation, the Debtor used the Condo as her primary residence and after the divorce, she became its sole owner. Currently, Mr. Hager resides there along with the couple's twin twenty-year old sons who apparently continue to live there for some unspecified part of the time. From the Debtor's testimony that one of her sons is intending to enter law school and that the expenses listed on Schedule J (Exh. 1 and 13) are solely for her maintenance, the court infers that both sons are attending college and not regularly living at home. In order to remain there, Mr. Hager contributes $750.00 per month toward the mortgage or the family's living expenses.

The Debtor also testified that the medical condition of one of her sons may at some point require him to spend more time with her at the Condo, but at present this is not required. Although she testified that the Schedule J expenses are her own, she did claim her college-aged sons as "dependents" in filings with this court. Other than this, the Debtor offered no further details about her household and general living arrangements.

The Condo is worth at least $300,000.00, based on the Debtor's testimony and other evidence, including local tax bills. As noted above with respect to the proposed strip-off of the MERS second lien, there is no equity in the Condo: the debt secured by the first mortgage exceeds the value of the residence.

D.    The Chevrolet Equinox

With respect to the debt to Ally Bank secured by the Debtor's vehicle -- a 2013 Chevrolet Equinox that she purchased for $22,000.00, including warranty, approximately six months before she filed this case -- the Debtor explained that last summer she decided she needed to replace her previous automobile, which she had purchased in 2006 and which had over 250,000 miles on it. As noted above, the Debtor drives approximately 136 miles (to and from work) each day, and requires reliable transportation.

She testified that she wanted a Chevrolet Equinox, and looked for several months for the best deal before deciding to purchase the 2013 model in September, 2016. She proposes to retain it under the Plan in exchange for a monthly payment to Ally Bank in the amount of $350.00. From this testimony, the court infers that the Debtor had made up her mind that she wanted an Equinox without fully considering other alternatives. Regardless, the car ownership expense is not extraordinary in the court's experience, and with approximately 40,000 miles on it, the Equinox is probably a substantial improvement over the high-mileage vehicle the Debtor replaced.

E.    Feasibility

The court shares Mr. Newmeyer's doubts about the feasibility of the Debtor's Plan for several reasons.

As noted above, $750.00 of the Debtor's $2,780.00 Plan Payment (or approximately 26%) comes from the Debtor's ex-husband for his share of the monthly housing expense under an informal arrangement apparently reached after years of acrimonious, finance-draining divorce-related litigation. Indeed, the Debtor blamed her 2009 bankruptcy filing largely on Mr. Hager's refusal to honor his child support and property settlement obligations, prompting litigation that extended far beyond that first filing. Ironically, her battle with Mr. Hager gave rise to Mr.

Newmeyer's substantial claim for representing her in connection with her long-running dispute with her ex-husband over his payment obligations to her, among other issues, showing that Mr. Hager also contributed, indirectly, to the Debtor's current filing.

The Debtor testified that the success of her Plan depends upon the $750.00 payment from her ex-husband: without the extra $750.00 the Plan will fail. Significantly, the Debtor is relying on the same man she claims ruined her financially, and whom the state courts convicted of felony non-support of his then-minor children. Nevertheless, as of the filing of the current bankruptcy case, and according to the Debtor's testimony, her ex-husband has since paid her everything he owed for his support and property settlement obligations, along with the $750.00 per month necessary to hold onto the Condo. It would appear that the criminal conviction eventually got his attention.

Moreover, given the central role that his contribution plays in the Debtor's Plan, and the unhappy history between the still-divorced couple, the court would have expected more robust evidentiary support on the question of Mr. Hager's crucial contribution, something beyond the Debtor's glib forecast that her ex-husband would "never leave her" again. There was no testimony or other evidence from the Debtor about how long this unusual housing arrangement with her ex-husband has been in place, or proof of how reliable he has been in making the monthly payment. Nor, for that matter, did the Debtor call Mr. Hager to testify, although her Plan depends on his payment. Perhaps his testimony might have persuaded the court that the "dead-beat dad," a felon convicted of not supporting his family, can now be counted on to save the Condo and the Debtor's Plan; perhaps not. The Debtor did not call him as witness, and instead simply vouches for him.

More generally, the Debtor offered no evidence about the current nature of the relationship, whether the couple has reconciled or whether the arrangement is a lark, a matter of temporary

convenience, or a life-long commitment.  The record contains no evidence of a lease between the Debtor and her ex-husband or other documentation showing that he is somehow legally obligated to make the payments.  The Debtor is not counting him as a member of her household, according to Official Form 122C-1, which reflects a household of 3 -- presumably the Debtor and her two sons (but not their father).

In response to the question about what she would do if Mr. Hager ceased funding her Plan, she said that she would get a roommate.  Notwithstanding this optimism, the court has doubts about the likelihood of the Debtor's finding a roommate willing to pay $750.00 per month to live in the Condo with the Debtor and her sons -- an unorthodox arrangement as Mr. Newmeyer pointed out in his closing argument.

Although the testimony and other evidence shows that the Debtor is capable of gainful, albeit episodic, employment as a legal secretary or paralegal, the income from her work as a contract paralegal is not sufficient, alone, to fund her Plan as proposed, and she must depend upon the informal arrangement with the man who, on her own account, ruined her financially.  The Debtor may be willing to give her ex-husband another chance, but Mr. Newmeyer and other creditors should not be forced to.[2]

The Debtor has not persuaded the court, by a preponderance of the evidence, that she will be able to make her Plan Payment, given the importance of Mr. Hager's contribution to the endeavor and the absence of substantial evidence showing a likelihood that he will or is able to pay over the life of the Plan.  The court finds that keeping the Condo is beyond the Debtor's means, and that her proposal for doing so, memorialized in the Plan, is not feasible.

---

[2] As described more fully below, the Debtor's gambling activities also undermine the case for feasibility.

F.      Good Faith

In addition to raising concerns about feasibility, Mr. Newmeyer challenges the Debtor's good faith in filing her Plan on the grounds that she gambled aggressively (and lost profusely) while not paying his claim (and others), and while incurring additional debt following the entry of her discharge in the first case.  He also contends that the Debtor's purchase of the Chevrolet Equinox six months before filing, and her efforts to keep the underwater Condo, further show her bad faith in prosecuting this case.  He argues, with good reason and support in the record, that the Debtor squandered her fresh start shortly after entry of her chapter 7 discharge in 2010, and he predicts that, as her creditors wait for a paltry dividend, she will squander the promise of her chapter 13 case, too.

With respect to the Chevrolet Equinox and its bearing on the Debtor's good faith, the court has considered the testimony and other evidence regarding the automobile, and does not regard the Debtor's purchase six months before filing as particularly compelling evidence of bad faith. Although it appears that she did not fully consider buying another older model, including models such as the less expensive used vehicles in the newspaper advertisements the court admitted on Mr. Newmeyer's motion (Exh. F), the court does not fault the Debtor for replacing a high mileage vehicle with a used, 2013 Equinox.  Having reliable automobile transportation in a district like ours, where public transportation is limited, is necessary for most debtors to get to work in order to earn the wages and other income necessary to fund a repayment plan.  The automobile the Debtor purchased in September, 2016, is not a luxury car, was three years old at the time of purchase, and itself had 40,000 miles on it.

Standing alone, the Debtor's purchase of the Equinox does not undermine her presumed good faith.  *See* Fed. R. Bankr. P. 3015(f) (in absence of objection, court may presume chapter 13 debtor's good faith).  The court, however, reaches a different conclusion with respect to the Condo.

First, the Debtor has not made the case for paying on property for which she may no longer be personally obligated, or for spending approximately $1,952.72 per month including principal, interest, taxes, insurance and condo fees.  With respect to the first of two mortgages encumbering the Condo, Debtor proposes that the trustee will pay $1,744.72, plus prepetition arrears in the amount of $10,000.00 during the Plan's 36 month applicable commitment period, and perhaps longer if necessary.  In addition, as set forth on Schedule J (Exhs. 1 and 13) the Debtor directly pays $208.00 per month in condominium dues.  Her total homeownership expense, therefore, is $1,952.72.  The Debtor, and presumably the Trustee, attempt to reduce the Debtor's housing expense by $750.00 to take into account the ex-husband's contribution, yet the Debtor herself characterizes the $750.00 as "income" on Schedule I and "Alimony and maintenance payments" on Official Form 122C-1 (Exh. 5).[3]  The housing expense is what it is, regardless of how the Debtor intends to fund it.

The logic of this seeming reduction in housing expense is doubtful because (as the Debtor admitted on the stand) her actual obligations to Select Portfolio (and for taxes and insurance) do not vary depending on whether Mr. Hager contributes or not.  The court finds that the Debtor's

---

[3] Strangely, both versions of Schedule J admitted at the hearing list the Debtor's "rental or home ownership expense" as "$0.00."  *See* Exh. 1 (Schedule J, line 4) and Exh. 13 (Amended Schedule J, line 4).  The actual housing expenses, though not patent on Schedule J, may be gleaned from reviewing the Plan.  Nevertheless, the Trustee, with the benefit of investigation at the first meeting of creditors or otherwise, apparently understood the Debtor's situation well-enough to recommend confirmation.  For its part, the court infers the Debtor adopted this approach because she intended to pay the mortgage "through the plan," which is to say, using the Trustee as disbursing agent for the Debtor's housing expenses (other than the condominium fees).  Indeed, at several points in her testimony, the Debtor indicated that the Trustee will be paying the mortgage.  In effect, the Debtor prepared the schedules to reflect the Plan, not *vice versa*.  Similarly, both versions of Schedule J omit her car payment, presumably for similar reasons.  This approach to listing expenses is inconsistent with the formal reporting invited by the Schedules, and is less transparent than it ought to be.

housing expense, including condominium fees, is $1,952.72. In the court's experience, this expense is high for a single person with adult children who only occasionally or periodically reside with their mother while enrolled in college.

Even if the court were to deduct from the Debtor's actual housing obligations the ex-husband's supposed share, the homeownership expenses associated with the Condo would be approximately $1,202.72, not including the $80.00 that the Debtor has budgeted for utilities, and the $141.00 for telephone, cell phone, internet, satellite and cable services. The "Local Housing and Utility Standards" available on the United States Trustee's website, based on Internal Revenue Service ("IRS") standards for comparable expenses in Van Buren County, Michigan, show mortgage/rent expenses (i.e., excluding heat, electricity, natural gas, telephone, cell phone, internet, satellite and cable services) for a family of one in the amount of $755.00, and for a family of four, $1,042.00.[4] So, whether the court treats the Debtor as living in a one or four person household, her mortgage/rent expense is high, or at least higher than the IRS local standards. The statements of counsel to the contrary probably do not take into account the condominium dues.

Indeed, the Debtor's housing decision has a profound and adverse effect on her transportation expenses, as she noted in explaining the need to purchase the Chevrolet Equinox. It directly and indirectly reduces the amount of money available to distribute to creditors. For example, based on the Debtor's tax returns, specifically IRS Form 1040 Schedule C for 2015 and 2016, while residing in the Condo the Debtor has incurred substantial transportation expenses (exceeding $11,000.00 per year) related to her job as contract paralegal in 2015 and 2016. *See* Exh. 6 and 7. Her Schedules J (Exhs. 1 and 13) reflect a monthly transportation expense of $330.00, which, the court infers, she could reduce by living closer to work in Grand Rapids, or its

---

[4] *See* https://www.justice.gov/ust/eo/bapcpa/20170501/bci_data/housing_charts/irs_housing_charts_MI.htm (local standards for cases filed after May 1, 2017).

environs.  Nevertheless, the Debtor testified that she never looked for housing in Grand Rapids, preferring to live in a $300,000.00 condominium in a lakeshore resort town nearly sixty miles south of her workplace, opting also to purchase a newer vehicle more capable of making the daily commute.

Retaining what the court infers is a resort property far from work is improvident, especially where the evidence establishes that the Debtor did not even consider seeking a less expensive and available apartment closer to work.  Some debtors understandably justify their proposed retention of a residence to protect equity, or their children with special needs or important educational, family, or social ties.  As for equity, the Debtor's testimony about the value of the place, and the Plan's treatment of the two liens, together establish that there is no equity to protect.  Furthermore, to the extent the Debtor, a former realtor, may perceive a rising demand for properties like hers near Lake Michigan in South Haven, the court balks at permitting her to play the market by diverting funds away from the payment of unsecured claims, including Mr. Newmeyer's.  As for protecting her twin sons, based on their ages it is clear that, unlike some debtors, she is not seeking to retain a home far from work in order to minimize social and educational disruption to them. Rather, she simply prefers to live in the second home that she bought when times were better, and she is willing to spend nearly $2,000.00 per month to do so, without so much as considering alternatives closer to her office.

The court certainly understands the natural desire of many debtors to keep their homes, and recognizes that Congress enacted the provisions of chapter 13 largely to help them do so. Nevertheless, the statutory requirement of good faith places a check on a debtor's ability to force creditors to subsidize improvident or extravagant lifestyle choices.  The court regards the proposed retention of the Condo as the Debtor's stubborn refusal to adjust to her present financial situation

and address her obligations to Mr. Newmeyer and other unsecured creditors (including taxing authorities), and, considering all the circumstances, indicative of bad faith.

Perhaps the most salient indicia of the Debtor's bad faith, however, involves her gambling activity which began at least as early as 2012, approximately two years after the court entered her chapter 7 discharge and continued after she filed this case. She testified that the source of funds for her gambling was the hard-won child support she periodically received from her ex-husband, her intermittent wages from working at several law firms, from unemployment insurance income, or proceeds from Mr. Hager's other debts or investment property. She gambled at a time when she remained obligated on some non-dischargeable and perhaps other debts that survived her first bankruptcy (for example her substantial student loans), and while she incurred post-discharge debt to Mr. Newmeyer for legal services, as well as new debts to credit card companies and medical professionals.

Rather than pay these claims, she took to the local casinos and filled their coffers instead. Indeed, the Debtor testified that she had gambling losses of between $6,000.00 and $10,000.00 per year during the period from 2012 to 2015, and $25,000.00 in 2016. In fact, according to schedules attached to the Debtor's 2015 and 2016 tax returns (Exhs. 7 and 8), in the last two years she had gambling losses of at least $22,477.00 and $49,923.00, respectively, at Gun Lake Casino alone, without reference to any losses she incurred at Four Winds Casino where, according to her testimony and documents, she also gambled. In any event, the Debtor's gambling losses obviously exceeded the deductions claimed on her tax returns.[5]

---

[5] Deductible gambling losses are capped at the taxpayer's gambling winnings, 26 U.S.C. § 165(d), so there may be no practical reason to identify on one's tax forms additional losses beyond winnings. This may explain the Debtor's failure to list losses from Four Winds Casino, and also suggests that her actual losses probably exceeded those deducted on her IRS Form 1040.

The Debtor also admitted that she gambled in April, 2017, shortly after filing her chapter 13 petition, and within a few months of the confirmation hearing.

When the court bluntly inquired why it, and the creditors, should take a chance on her in this bankruptcy proceeding given her history of gambling and frittering away her chapter 7 discharge, she sought to minimize the adverse impact of her conduct by claiming that she has been diagnosed with "Post Traumatic Stress Disorder/Litigation Abuse Syndrome," and that compulsive gambling is a symptom of the disorder.  She stated that she is seeking professional treatment and participates in Gamblers Anonymous.  Significantly, however, she offered no evidence other than her own self-serving testimony about the supposed diagnosis or common symptoms and, assuming the truth of the statement, the specific steps she is taking to address the behavior.

Although lacking expertise in this area, the court typically associates Post Traumatic Stress Disorder or "PTSD" with sudden injury and trauma, not the judicial process.  Even recognizing the stress that litigation brings as a general matter, the court must insist on a stronger evidentiary showing, including expert testimony or at least documentary corroboration, before excusing as a symptom of illness behavior that is equally consistent with culpable recklessness or high living. The Debtor's facile and unsupported reference to a litigation-related gambling addiction did not persuade the court to excuse what it finds is improvident behavior that, under the circumstances, amounts to bad faith.[6]

---

[6] Even if the court were to credit the Debtor's supposed medical explanation, a gambling addiction would only serve to exacerbate the court's concerns about feasibility, especially given her concession that she gambled after filing her current chapter 13 petition.

IV.  CONCLUSION AND ORDER

As noted above, the factors or guideposts designed to assist courts in ferreting out bad faith do not all point in one direction in this case, nor does the case law require such unanimity.  Rather, courts must consider the totality of the circumstances.

Here, when the record evidence shows that the Debtor is making decisions about a consumer's most consequential expenditures -- her residence and automobile -- as a means of perpetuating a former lifestyle without even considering less expensive and more prudent alternatives, the prospects for confirmation dim.  And, when the court reads a Plan that (without meaningful justification) proposes to retain an underwater resort property as a residence -- not to protect children, or equity, or access to employment -- at a cost of nearly $2,000.00 per month, while proposing to pay unsecured creditors that same amount over three years, the record shows more than a tincture of bad faith.  And, when the court considers that the Debtor has squandered the benefits of a chapter 7 discharge by gambling away wages and other income, child support, unemployment insurance payments, and proceeds from the sale of prior investments, while incurring additional and unmanageable debt, the image of the "honest but unfortunate" debtor described in *Local Loan Company v. Hunt*, 292 U.S. 234, 244 (1934), and elsewhere, does not spring to mind.  In short, given the totality of the circumstances presented on this record, the court cannot, and does not, find that the Debtor filed her Plan in good faith.  Coupling this finding with its doubts about feasibility, the court will enter an order denying confirmation.

Finally, the court reminds the parties that today's order resolves a contested confirmation, not a motion to dismiss.  Indeed, even Mr. Newmeyer in his plan objection only seeks dismissal if the plan is not "radically revised to reflect reality . . ."  *See* Creditor Lawrence W. Newmeyer's Objection to Petition and Proposed Plan at p. 6 (ECF No. 23).  Because the court's decision is

premised on the totality of the circumstances, including the terms of the Plan and the means proposed for execution, a "radically revised" plan might change the circumstances and win Mr. Newmeyer's (and the court's) approval. Under the circumstances, the Debtor should have a limited opportunity to consider her options, including meaningful revision of the Plan, voluntary dismissal, or (less likely) conversion.

NOW, THEREFORE, IT IS HEREBY ORDERED that confirmation of the Plan is DENIED.

IT IS FURTHER ORDERED that the court will dismiss this case promptly after September 28, 2017, unless the Debtor sooner files a notice to convert, a motion to dismiss, or a substantially revised repayment plan together with a motion seeking its approval.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Lawrence W. Newmeyer, Esq., April A. Hulst, Esq., Courtney K. Roberts, Esq., Ms. Darcy A. Hager, and the United States Trustee.

**IT IS SO ORDERED.**

**Dated September 5, 2017**



Scott W. Dales
United States Bankruptcy Judge